Thank you, Judge Clifton. Good morning, Judge Fischer, Judge Rosenthal. Good morning. Originally, we had proposed to split our argument, but we have decided not to do that, and so I will be presenting the argument on both issues. And with the Court's permission, I would like to address the civil rights issue first. Also, I'm hoping to reserve some time for rebuttal at the end. You know how that works. Yes. In Garrett F., the Supreme Court held that school districts are required to provide specialized physical health care services to disabled students. And the Court made it clear that this was an issue of accessibility, that these were necessary to provide meaningful access to the public school, and this was distinct from the level of education that was required to be provided once the student had the access. Now, in Mark H., this Court discussed the difference between a violation of the Individuals with Disability Education Act and Section 504. And the fundamental distinction is that in order to arise to a 504 violation, that the something more has to be a restriction on the ability to access. And that's exactly what we have here with this particular type of a need and an accommodation. Now, of course, to get damages under Section 504, it's necessary to satisfy the intent standard. And in Duval, this Court made very clear that this is an objective measure, that it's deliberate indifference and all that need to be shown is a knowledge that a harm to a federally protected right might be substantially impaired or is substantially likely to be impaired, and that there was a failure to act on that likelihood. Can you help me understand how the per se rule you are advocating is consistent with the usual way we approach questions of intent, even when they are questions of deliberate indifference? Yes, Your Honor. In Duval, the requirement was that you have to make a meaningful investigation of what accommodations are necessary in order to meet the needs of the disabled person. In Duval, that meant talking to the disabled person themselves. But when there's a statute that says here's the minimal requirements that you need to do to provide this accommodation, that's the investigation that needs to be made and that's what needs to be complied with. So that really substitutes for going to the individual and asking what is needed. How explicit is the statute in spelling out who's qualified? It is very explicit. It has several different qualifications, including that they have to have a CPR certification, that they have to have familiarity with the medical systems and procedures that are being used, that they have to have a specific training as to the specific service that's going to be provided pursuant to established protocols. It's not ambiguous. It's very clear. Speaking at least of the time before the ALJ, the hearings officer, came out with the report, was it evident that, and this I understand gets to be hypothetical because he wasn't attending school at the time, but is it clear that the school district did not have somebody who could have met the statutory qualifications? On the contrary, it was clear that they did. They had several different job descriptions. Certainly a nurse could have done it easily, and there was a full-time nurse there. But there are also other job descriptions that they had, a specialized education technician and a specialized education health technician. But the ALJ did not in its decision require any of those particular people. And the opinion seems to be quite clear that the school board is left with discretion to decide who's – who can be designated to fill that role and how much training is going to be enough. Well, I'm certainly on the point of who could be designated. Yes, they don't have to use one of those job descriptions. It could be a BSA person with sufficient training. It could be a janitor, Your Honor. It doesn't matter. If they have the proper training. If they have the proper qualifications and training. And that's a judgment call, isn't it? No. It's in the statute. What's – first of all, there has to be the CPR certification. That's fine. That's objective. But the extent to which the training is necessary to meet the competency requirement, isn't that some measure of judgment involved? Well, it has to actually – the statute says it has to be done pursuant to established protocols that were established in consultation with the medical professionals. And when the school – at the hearing, the school district was not able to show that it had met that standard for training. Now, again, under Duval, all they had to do was read the statute and comply with the statute. Now, the behaviorally did not even have – How does that fall into deliberate indifference as opposed to negligence? Because under Duval, if you know what is – you made your investigation. You know what's required to be provided. You don't provide it. And then what you did provide turned out to be inadequate. That's deliberate indifference. That's all it takes. How do we know what they provided? That's what seems hypothetical to me, because they weren't called upon to actually provide somebody. So we don't know who would have been prepared to be responsible for or supervise the G-2. On the contrary, Your Honor, the – that issue was actually litigated in the administrative proceeding. They had not, in fact, designated a person in the individualized education program, but nevertheless, the court then went and went further and addressed who they claimed was going to be doing it. They said, oh, well, we meant that the behavioral aid was going to do it. And the court – the ALJ then allowed them to put on all of the evidence as to the qualifications, training, what was proposed for the behavioral aid to make them able to do it, and found it was far from adequate and did not even meet the statutory minimal requirements. But then the court says, and I'm not going to tell you how to do it, because that's something that I'm going to leave it up to you guys to figure out. That's correct. And if they took a behavioral aid and they got the behavioral aid CPR certified and they spent enough time to familiarize the behavioral aid with the medical procedures in general, and they developed protocols that were developed in the consultation with medical professionals to use to train that behavioral aid, and they provided a system – Didn't they have G-2 protocols already? Because they had a lot of people who were getting G-2 supervised feedings within the system, didn't they? Wasn't that the case? Your Honor, at the administrative hearing, they had a chance, an opportunity to present them. They did not do so. There may have been protocols, but there were not the training methodology that was necessary. You know, what exactly – Training hours or training methodology? Well, both. You know, what needs to be done specifically to train someone to do this? Now, interestingly, if you look at the job descriptions and the difference between a special education technician and a special education health technician, only the health technician is qualified to administer G-2 feedings without the direct supervision of the nurse. But the AHA did not go that far, did they? No. And did she? No, she did not. But if you're wanting to look at what it would take to make one qualified, you can look at what the district itself believed was necessary to make one qualified. And to be a special education health technician to independently provide the G-2 feedings, you had to have a year of experience as a special education technician. And that was – that meant a year of doing it under the direct supervision of a nurse. So apparently that's what the school district itself thought was necessary in order to meet the training requirements. And yet here they were going to use a behavioral aide who did not have CPR certification, who did not have any kind of background or training in medical – use of medical items and the mechanics, and train them in, you know, three hours at most. And it just wasn't sufficient. And you can't – you know, what the district wanted to say is, look, this is good enough. Yeah, we haven't done what the statute says, but we think it's good enough. Well, it wasn't good enough. It wasn't even good enough to allow him to attend school safely. And that was the big problem. Can you respond to the evidence, or at least the arguments, that during most of the period in which these discussions were going on and lots of people were putting in collaborative effort in trying to figure out how to craft a plan, that the emphasis was more on providing a place where the child could lie down after the feedings in opposed to who was going to be administering the feedings? Yes, Your Honor. The child had been in school before this. And it hadn't been an issue. It was either a nurse or a special education health technician who had done it. And the record is very clear. The nurse herself testified. Mrs. Bernese simply assumed that was going to be the same. She had no reason to really think they were going to change this and suddenly use a behavioral aide. It was only until later in the process when she began talking to the doctor about the health services plan that she realized they were not planning to do it the way they had done it before. And that's so it did not arise until later because she didn't really understand that it was going to be a problem until later. Now, in addition to what... One more question on this before you move to your next area. Do I correctly understand you to be arguing that you want a per se rule, that whenever there's a violation of the statutorily or regulatorily prescribed method of administering a particular service that state law dictates, there's going to be an ADA or 504 violation? Or do I understand you to be arguing that on this record there is sufficient evidence of deliberate indifference to satisfy the 504 standard? Well, Your Honor, certainly the latter argument is all I really need for my case, and I'm happy to, you know, to rest on that. But I do think it's appropriate for this Court to send some guidance to school districts that if you're going to provide an accommodation, and the statute tells you how to do it, that is really the minimal requirement. And if you don't at least do that, there really is no you can't substitute your judgment for what you think will work. That is what needs to be done, because you can't take a risk with these children. This is a health and safety issue. The statute says here's what's necessary to do it safely. That's what they should do. Now, the other issue in the civil rights case has to do with what happened after the order was issued. The parties began implementing the plan, as corrected. But first of all, of course, the school district appealed, and it made it very clear they were not happy about not being able to use this behavioral aid with the minimal training they proposed. The school district did add the language that was required by the administrative law judge that the nurse would be performing this, but they didn't increase the nursing hours. Sotomayor, I thought they later increased nursing hours. Actually, the judge got that wrong. That was in the subsequent IEP. In this IEP, they just didn't increase the hours at all. And, you know, the district judge in discussing this evidence said, well, you know, that's fine. Are you talking about the 2007 IEP now or the 2006? No, the 2006. Okay. Thank you. Okay? And so, you know, they didn't do it, and that was raising concerns, that they really were not going to provide this nurse. Two months after the ALJ decision is issued, they held another IEP. It's exactly the same in all regards except that the behavioral aid is back there in the IEP just as before with the same number of hours of training. No difference. Now, the parent was very upset about this and said, we just litigated this. This is not appropriate. You need to do what the ALJ said. And the school district ignored her, and then they filed for due process against her. Now, the district judge found, well, you know, it was another year, and maybe he didn't have the same level of need. So it was, you know, maybe it was okay that he didn't need as well-trained a behavioral aid. Pure, you know, first of all, speculation. Secondly, you know, based on absolutely nothing, you know, nothing really had changed that much. And it's not a function of the child's ability. It's a function of what is necessary to keep the child safe. We believe that at the very least, this is a jury question, that a reasonable jury could disagree that this was not, in fact, complying, and that they retaliated by, because they were so annoyed about having to use this BSA, that they retaliated and they put a new IEP in, put the same provisions in, sued her again, and you're going to have to go through some more litigation with us, not only in the district court, but we're filing against you in due process. And at that point, she had enough, because at that point, she believed they were never going to do what was necessary. Again, we think this, at the very least, is a jury issue, that a jury, a reasonable jury could conclude that they had not done what they needed to do. Now, Your Honor, I am running very short on time, and I still have the fee issue to address. So let me quickly turn to that. Kennedy. I want to make sure the IEP we're looking at, where there's the factual issues on the 2007-2008 school year, we went through the evolution, but that was the one that was the one that was amended. I'm sorry, that was the new one. The December 2006 was the one that was amended to supposedly comply with what the ALJ ordered, but did not, because it didn't include enough hours. But which one are you focused on? On both. On both. You know, that all of this evidence together indicated that this school district really had no intention of complying with the statute. Okay. Now, with respect to attorneys' fees, the standard is normally abusive discretion, but, of course, if there is errors of law or errors or clearly erroneous fact findings, that standard doesn't apply. And here we have both. But this one. Because you are running out of time. I think there's a very important issue in this that seems worth talking about, and I want to make sure you get a chance to address it. In the back-and-forth on the settlements, which the district court found against you and your client because of the way he perceived unreasonable rejection and the like, you did make a counteroffer, which suggested that your client was willing to accept a monetization. And under the Rule 68 analog, I'm having trouble understanding how a court evaluates the bona fides of insisting on a FAPE, a fair public education, but then getting into negotiations where the district is, in effect, offering money to provide in a public school, I mean a private school setting, to provide what it perceives is enough money to deal with all of the concerns that the parents have. So how is a court supposed to evaluate whether the parents are being reasonable or not in rejecting a counteroffer or an offer, 150,000 versus 200,000 in this case? What's the process under the Rule 68 analog? Well, the first threshold issue is can a statutory offer include a provision that requires, as a condition, that the child be exited from the whole entire public school system for an indefinite, for years into the future. By putting that kind of a provision in a statutory offer and then penalizing a parent if they turn it down, essentially what you're doing is you're giving the school district the ability to insist on a license to discriminate. I understand that part. Okay. Okay. So it goes to the point where you engage in the, okay, we'll monetize it, we've evidenced by our counteroffer a willingness to consider that, but you have to pay us enough money. So what's the process for evaluating reasonableness there? There is no objection to a voluntary agreement to enter into, a voluntary agreement to do that. That is perfectly fine. The problem is if the parent decides not to do it voluntarily. But more importantly, the statute requires an objective comparison, not between what the parent counteroffered, but between the settlement offer at issue and what was obtained in the due process hearing. The problem is these two aren't even in the same ballpark. They're not comparable, which is why the judge resorted to this preference comparison. Well, there is absolutely no authority to do a comparison based on the parent's preference. And it's an extremely dangerous thing to do, as we see in the Solano Beach case. This is supposed to be an objective comparison, trying to figure out what is in the parent's mind and, you know, what they intended and what they preferred based on a counteroffer. Now, but let's talk about the counteroffer. Okay. I want to understand that. We know what they sought, what the parents sought in the due process hearing. We know what they got. Presumably all of the issues that were of concern to the parents were put forward by the parents. So if one steps back and says, okay, the district, in order to avoid further litigation, puts forward a monetary offer that does put the child in a private facility, although there is the opportunity to return to the public school, you know, on an annualized basis or whatever. But without getting sidetracked on that, we now know objectively what the parents wanted to the district to provide. So if the district puts forward a sum of money which they contend would be sufficient in a private facility to cover all of the concerns that the parents have and provide what the, that they've objectively put forward in their own complaint in the due process, and then the parents counteroffer and say, okay, that's not enough money. Give us $50,000 or whatever more, and we would accept that. How is the court supposed to evaluate that? It's not getting into the subjective mind of the parents. It's just looking at what they put forward. And if the evidence is that, yes, $150,000 would have been adequate to provide all of the relief that was sought, why wouldn't that be a legitimate way to evaluate the reasonableness of the parents' rejection? Well, first, because that $150,000 was coupled with eliminating the school district's  And that is something that the school district could never get in a due process hearing. They cannot rid themselves of the responsibility to educate this child. Secondly, if you do look at the, you know, this idea that it was all about money is simply not true. If you compare the counteroffer with the settlement offer, money was only one of the many issues. Fairly, a much more significant issue is the conditions on getting the child back into school. The school district said, first of all, you're out for two years. Secondly, if you want to come back, you cut off their money, and you come back with whatever IEP. We cut off the money, so you have no choice. You have to come back, and you come back with whatever IEP we offer. Now, with this parent, it was very clear a condition like that would mean the child would never get back into school. It made it look like he had an opt-in, but he didn't, because this parent clearly was not going to accept anything that they offered when there were issues of health and safety, among other things. And that their previous offer didn't provide for a safe accommodation. So, you know, it looks superficially that way, and there were other things as well that were different in the counteroffer. When a school is responsible for a child, they have to deal with the fact that something might happen that might substantially change the child's needs. Here, with the settlement offer, they were basically, you know, not responsible. So if something seriously happened to this child, it doesn't matter. You get the same amount of money. Now, the other issue is, whatever the amount of money was, there was no evidence whatsoever that there was another school that would take him, that the mother could find a placement for him that would be appropriate. And so the alternative she realistically was facing was continuing to educate him in her garage. And she did not want to do it. Keep in mind, this mother never homeschooled this child. She pulled him from school in 2003 because they weren't educating him. And the California Department of Education investigated and said, you're right, he's not even being instructed by a teacher. The teacher has had the behavioral aid do all of his teaching, and she's complaining she's not competent to do it. She can't do it. It's not in her job description. And that's why the mother pulled him, which was her right. Now, if she had enough money and could find an appropriate placement, she would have been well within her rights to put him there and then seek reimbursement from the school district. But she didn't have the money. And so she came up with the poor man's alternative, do it herself in a garage. But this was far from her preference. And she kept negotiating with the school district between 2003 and 2006. There were due process cases filed. There were settlement negotiations to try to get this child back into public school. Breyer. I think we know the record. Thank you. So the idea that this was actually her preference is simply not true. But at the time, and if you look at that settlement agreement, you'll see it wasn't just more money. It was more money to be able to hire a teacher, because Mrs. Bernisi was done with doing it herself. She had money that she had gotten from a prior settlement that originally caused the damages to the child to be used for her education. That money was going to expire. She wanted to go back to school. She, in fact, subsequently did go back to school and, you know, was very successful. But she wanted to do that. She did not want to be his teacher anymore. And frankly, she didn't want him in the garage anymore, because he had no exposure to other children. And that's the other fundamental principle of the least restrictive of the in Honig, that the school has to provide an education in the least restrictive environment with other non-disabled peers, which she knew was not going to be possible with this settlement agreement. So, no, it wasn't her first choice. But in light of what had happened, the unsuccessful efforts to come up with an IEP, the due process – the idea that they were now having to litigate, you know, all the struggles. They put him in one school. He got kicked out. They proposed another school. It didn't have a nurse. They didn't have the appropriate accommodations. Yeah, she was a little frustrated and understandably considered that as an alternative. But the idea that it was just about getting more money is simply not true. And it really is, in fact, a clearly erroneous finding that was based on double hearsay in a opposing counsel's declaration and improper inferences that, you know, the district judge apparently thought that she was correct. I think we've got the position. I'm sorry? I think we've got your position. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Sarah Leilani Wanda-Sutherland, and I represent San Diego Unified School District. In this appeal, appellants have engaged in an exercise of revisionist history to try and fool this Court into overturning a sound and well-based decision of a   This is not the case. This is not the case. Their fabricated reasoning, crafted in hindsight, is not asserted in good faith and their rationales and arguments, most of which were only in first articulated before this Court. When you read an appellant's brief, it's like jumping into a completely different case. I think you do yourself better if you get to specific instead of dumping all over the way your opponent presented their case. We can make that judgment. What we need your help in is responding on the discrete points. Yes, Your Honor, and I guess I was getting to those discrete points, which is that this case was not all about a nurse. There were several IEP meetings, dozens of hours, over 25 dedicated professionals, 34 witnesses, 10,000 pages of exhibits, or pages of evidence, nearly 600 exhibits. This case was not about a nurse. Prior to the due process hearing, none of this was discussed. The IEP did, in fact ---- Why is that determinative? It's determinative, Your Honor, because under the scheme of Section 504 and the Americans with Disabilities Act, in order for a violation of the IDEA to amount to intentional discrimination, there has to be something more, as appellants have acknowledged. Well, at least by the time of the ALJ's decision, your clients on notice that there are certain minimum requirements derived from California statute, and the plan that was proposed after that did not appear to meet those requirements, or at least arguably did not meet those requirements. Why is that not a colorable civil rights claim? Your Honor, as Justice pointed out in the appellant's argument, the statute is not clear. It specifies who the district ---- But the ALJ rendered a decision. And so I pick on that time. By that time, the school district knew what the ALJ said it had to do. And yet after that, the school district proposal did not seem to satisfy what the ALJ said is the minimum. Your Honor, the school district proposal did satisfy the ALJ's minimum. The ALJ found that the district did not meet its burden to establish that the training offered in the IEP was sufficient. And in fact, it was all based on finding that the IEP was not sufficiently clear. When you look at the IEP and the transition plan, the very first bullet says that the parent would meet with the nurse and determine who would do the G-tube feedings. That was not something the IEP team has decided. And as Ms. Tiffany pointed out, had never been an issue between the parties in the years of litigations and issues. The student was pulled as a result of a perceived lack of academic progress and access to a teacher. The parent created the home program with $157,000 a year of support from private providers, OTs, speech-language pathologists, non-public agencies. She was not left to do it on her own in the garage. The district's plan was to designate that person as a part of his transition to school with the nurse and the parent. The IEP never ‑‑ there are several references in the IEP to G-tube feeding, the need for training, the need for the nurse to meet with the parent. Kagan. You're talking about the 2006 IEP. Yes, the 2006 IEP. The special factors in the IEP. What about the number of hours that the nurse was going to be available? Because it seemed to simply repeat the number that the ALJ had found inadequate. The 2007 offer did maintain the same number of hours, but it included additional pages of information about how the nurse would train the BSA and the nurse explained it and why it was sufficient. Paraprofessionals often do these in the school setting. 95% of these are provided by paraprofessionals in the school setting or credentialed teachers. They are not health professionals. The G-tube feeding was not only referenced in the special factors. The nursing assessment of this child was included in the IEP and specified that he needed adult supervision for all G-tube feedings as well as the plan for training. The transition plan had numerous parts in it. The student actually had an IEP goal that the district proposed because its understanding was that the student needed prompting in order to stay on task and administer his G-tube feedings as quickly as they could be. His parent testified during the hearing that it should only take somebody five minutes, but it takes him about 20. The IEP goal recognized that and had both an OT, the behavioral aide, and the nurse working with the student to improve his independence in administering his G-tube. He was also in a home program. That's a slightly different subject. It's the same G-tube, but the requirements with regard to health and safety as to who's qualified to supervise the process and the desire to make him more self-sufficient are somewhat different subjects. The issue here, as I understand it, or the claim, is that the school district failed its responsibility and, in the allegation of plaintiff, was deliberately indifferent in that failure by not providing someone to supervise who met the statutory requirement. And the statute and the regulations governing medication administration in school, of which G-tube feeding is a medication administration in the school, they involve judgment calls. They are not clear. They do not say a nurse must do it. They say that the district must provide a qualified person, and it may include a certain list of people. It says they have to have CPR certification. Of course, that is objective. But it also says they have to have training that professionals in the field believe is competent. There was a physician and several nurses that testified that they were competent and intended on providing that training. The training was going to be correct. But there was a limitation. And, frankly, I never understood, and maybe there are too many pieces and I just missed it, but I never understood why a limitation on the number, a specified number of hours. What was the point of specifying a number of hours for the nurse? Your Honor, that number of hours was, is typical for a student being G-tube fed because they are most often provided under the supervision of a nurse. I just, I can't figure out conceptually. I understand from the school district's perspective they are trying to do personnel planning and so forth. But to specify, okay, we'll devote a nurse to this task for X hours without being able to speak to the variables of what happens with that particular student, I just didn't understand. Why would the school say we'll provide X hours, and I've forgotten what the X was. It was three and then nine and so forth. We'll provide X hours, what if the student needs more? Well, Your Honor, that's the beauty of an IEP. You change it. You sit back down at a meeting. The IDEA requires the IEP to be reviewed at least annually, but more frequently as required by the child's needs. As I mentioned previously, in crafting the IEP, the district made its best estimate of what that service would be, and it had a plan in the transition plan that involved the nurse being involved with the parent and coming up with more specifics. If that resulted in a need to modify the IEP, there was nothing that precluded that. It's not a performance contract or something that's set in stone for a year. In fact, IEPs are often modified throughout school years based on the changing needs of the child, changing programs, all those sorts of things. And so there was a number offered, and it was based upon what the district usually requires to provide this service to a student with G-tube and other health needs. There were four different health plans, four different areas covered in the student's health plan, not just G-tubes. It made a reasonable estimate. The parent never asked for more. There was, you know, at least six IEP meetings that I personally attended, and the parent never asked for more nursing time. You're talking about before the OAH? Before the OAH, and while the December 4, 2006 IEP was being developed. It was developed over the course of at least four meetings, if not six. I was at every single one of those meetings, and there was never a request to increase nursing time. About the 2006 IEP? About the 2006 IEP. The BSA was on every IEP. The behavior support assistant is a specially trained aide, and his primary function was to assist Tyler in managing his behavior so that he could access his education. The instruction that was being provided to him, that person was going to be with the student every hour of the day he was in school. The G-tube feedings were going to occur in the nurse's office with that person supervising Tyler self-administering the G-tube feedings. And did the plan spell out that that person satisfied the requirements that were laid out in particular in the ALJ's decision? The district's belief that it did is very reasonable, because of all of the evidence that was put forth at the district court about why this was not a central issue and why the decision had not been made. So much of this is very speculative, because as I mentioned, in planning for this IEP, the IEP was going to identify all the needs and the services that the child would need, including a full-time one-to-one aide and a nurse. And then the additional specifics of the day-to-day was going to be in a health plan, and the IEP referred to the health plan, referred to the training, referred to the nurse meeting, referred to the nurse designating a person, and there was no solid plans. This issue of the BSA, in fact, came up at the hearing when the ALJ wanted to know, well, who was going to do it, because the IEP was not specific. That's why it goes back to what I mentioned a little bit ago, which was that this finding was based on a lack of specificity in the IEP. And what the ALJ said is that the IEP should have been specific in that area, and you, school district, should not. The following, we received the decision in October of 2007, and immediately revised the IEP, sent it to the parents, told them that we wanted to implement it, worked towards implementing it. Of course, by then, a new annual IEP was due. The IDEA requires an annual review of the IEP, and there's case law cited in our briefing that, you know, describes that every year the district has to review an IEP, and just because we're in an administrative hearing over an old one doesn't eliminate the obligation to offer a new one. And so the district was obligated. And what did the new one say? The new one provided for the same plan, but the additional specificity that the district believed the ALJ was trying to require. But no additional hours and no more specificity as to the protocols that were used for the training. Is that correct? At least initially. It did do that at a second IEP meeting. It convened two IEP meetings to develop the annual IEP offer for the following year, one on November 29th and the other on December 19th. The second meeting was convened just for that purpose. And the parent told the IEP team to call her attorney and ask them what she wants and didn't want to engage. And there were the number of hours increased at that point? Yes, they were. The other issue, which, you know, the ALJ did not find in the district's favor later on, but the district was not, all of the transition plan activities were not included in the services on the IEP. The services on the IEP were once the child was transitioned to the program and there and receiving services. The transition plan, if you read it, provided for dozens of hours of time from every professional that was working with this student. You know, there was an OT, a speech language pathologist, a behavior specialist, a PT, a music therapist, a vision therapist, all of those folks, all who were providing services in the home program, were to collaborate with all of the people that were going to be providing it in the district, go to a bunch of meetings, spend a bunch of time shadowing. All of those hours aren't in the services page either because the district saw all those things as transition activities, things that were designed to prepare for the student's return to the school-based setting. They were not intending to account for every minute of time spent in those transition activities in the hours that were ongoing once the student had transitioned to the program. And so the hours on that front page weren't meant to capture every minute of everyone's time that was going to go into serving this student. You know, the hours of IEP meetings weren't, you know, listed on those service hours either. And so I know that the student is objecting to nursing services particularly at this point, but that same argument would have invalidated every other service offer in the IEP. Do you want to speak to the attorneys' fees issue? Yes, Your Honor. Use up all of your time. The standard for attorneys' fees under the IDEA is very clear. The threshold to reach prevailing party status is low, but the degree of success is the most important factor in determining an award of attorneys' fees. You cannot determine the degree of success without looking at what they asked for versus what they got. Appellant is asking this court to rule that you should look at what they got at the time the administrative hearing decision was issued and that that is an intangible remedy that no matter what justified their decision. That's not what the IDEA attorneys' fee case law and its progeny talks about. What it talks about is looking at the degree of success and the overall litigation. Here we are today. The student is 20 years old. He's graduated from high school with a high school diploma. He's in college. We're arguing over what he should have been doing in seventh grade. And appellant wants the school district to pay almost $1.5 million in attorneys' fees for that. The district court judge's attorneys' fees decision is very well reasoned. It's very lengthy. He goes through many alternative arguments. He not only talks about the settlement offers. He seems to offer two grounds. One, based on the comparison between the offer that was made or focused on plaintiff's failure to accept the offer, the cash offer, the $150,000 per year offer. And the second is an alternative based on his assessment of degree of success, but in a way that was, at least by my reading, not very clearly articulated. It's difficult for me to say based on anything other than a global, it's my sense, they won this much, I'll give them this much. But not a detailed articulation. Surely you've seen the kind of awards that spell out, okay, these issue this way, this issue that way, these hours for that, this hours for that. It was a very feel-type conclusion. Is that, would you fairly accept that, or would you accept that as a fair characterization of the calculation done by the alternative approach by the district court? To an extent, Your Honor. I do believe the judge, and you can tell from his decision in going through the attorney fee calculation, that he did carefully consider specific amounts prevailing on certain issues, not prevailing on other issues, issues that were related, unrelated. The other thing I would say to that is that, you know, this court can uphold it as long as it's supported by the record. The district court judge was not obligated to articulate every single reason, and it's not meant to be specified with formulaic. Well, we can, but I've got to say, it's difficult for me as I go through here. And I'll focus on maybe something that was a tangent. There was a particular, what kind do we call it, the compliance complaint. An agreement between the parties is a certain amount of money, and that agreement was going to provide for payment of reasonable fees. At the end of the day, the reasonable fees awarded by the court were zero, with no explanation for that other than, well, they got the compliance money, but the agreement provided for fees, too. Well, with that as an illustration, I don't know that I have such confidence that the district court's global sense as to what's right here, without a more detailed explanation of what issues go on which side of the ledger and what time is appropriately paid for, I lack a little confidence in that. Well, first of all, Your Honor, there was not a zero fee award. There was a reasonable fee award of over $50,000. If not, after a certain date, there was zero. And all of these were incurred prior to that date. That's my point. Yes. And so there was a reasonable fee offer. There was not a zero offer. And I will also mention that $50,000 is not a small offer, not a small award of attorney's fees under the IDEA. Most of these cases, you know, are litigated through appeals for $150,000 total, even when they win on most issues or the fundamental issues. This is not an insubstantial claim. I mean, the offer which the district court basically is saying the plaintiff should accept it was $150,000 per year for several years. So, you know, $50,000 is a lot of attorney's fees for some things, not so much for others. This case wasn't trivial. No, Your Honor, it was not. However, on that compliance complaint issue specifically, they incurred $7,000 in fees to get 24 hours of compensatory education. The district had offered to you. The parties reached an agreement. I mean, I don't have it in front of me right now. But as I recall, the agreement says, okay, this is the amount for the compliance and there will be reasonable fees. What reasonable fees were ordered for that? Well, I guess what I'm pointing to is what was before the district court judge, which was that the total of fees incurred was a little over $7,000. The district had expressed a willingness to pay for it. No response was provided. The district then offered to pay $3,500. No response was provided, and it appeared in this case. In this case, they spent $48,000 in fees to collect $3,500. That is patently unreasonable, to incur $50,000 in attorney's fees to collect $3,500 more, when the district was clearly offering to pay and they were nonresponsive. I think that the record will reflect that. And even though the district court judge didn't actually go through that, he has the discretion to determine that that was the reasonable fees on that $7,000 was zero. Is that the one where he said that it had already been taken care of, the fees had been taken care of in that settlement? Yes, Your Honor. The district eventually provided an offer of judgment that was for the total amount of fees sought for the compliance complaint, plus reasonable attorney's fees, and the district court felt that that was sufficient. So, well, that's what I was referring to. The plus reasonable attorney's fees turned out to be zero. Uh-huh. And I think that that was reasonable. And would you address the issue of the cutting off post the rejection of the offer? Counsel raised the issue of what that means under the IDEA. Yes. That is a troublesome argument. Yes, Your Honor. And I think Appellant's effort to make this a public policy issue is not well taken First of all, this was a confidential order filed under SEAL that Appellant's asked to be made public. And so the idea that this is going to somehow create a chilling effect because of one district court decision under SEAL in the Southern District I think is untrue. Secondly, plaintiff's characterizations of the settlement offer are not accurate. They did not require him to be out of all public school systems. There's over 1,000 school districts in California. This was not, you know, the only one in town. None of the offers were contingent upon him never being in public school. The district was offering We're taking you over time, but this is important. It's my understanding that this basically was the end of the road as far as this school district was concerned. Is that correct? I'm sorry. I don't know what you mean by that. Well, the offer was we'll pay $150,000 a year to continue his education. He will not re-enroll in the San Diego Unified School District. That is not what the offer said, Your Honor. The offer began with a letter from the Parents' Council in May of March or May of 2006 prior to the administrative hearing where he told the district, I quote, from our perspective Let me tell you what at least my concern is. I understand that this might be a reasonable way for parties to settle a situation like this. My concern is that if it's not a voluntary settlement, can, I mean, the argument being offered up by the plaintiff is that the school district can write a check and make sure that the student doesn't come back to their school. And that's far from what the district was offering to you. But that seems to me what's playing out here, isn't it? If the district court is saying the plaintiff should have accepted this offer and by not doing so they were unreasonable and can't get attorney's fees, they're basically saying once they offer you amount of cash, whether or not you initiated the discussion of amount of cash, once they've offered that to you, the district court deems that better than you got otherwise, then you're out. You lose. You're expected to take that. Well, I think that goes to one of the very important parts of the IDEA that this settlement offer did comply with, which is early resolution to the benefit of the  It was not a voluntary agreement. There wasn't an acceptance of an agreement. The parties are free to reach a deal. But if they don't reach a deal, the issue here is can the court, in effect, or the school district, foist it on the plaintiff by saying you should have taken this settlement and didn't. As a result, you're not going to get anything further. Basically, it becomes at that point you have to take cash. You can't take the student back to the school district any longer. That was not the offer, Your Honor. Can I ask a question about that? Go ahead. I would like to hear you explain why it wasn't the offer. Yes. So there were three settlement offers made over a period of time. They were not all this. This was what the parents were consistently asking for and what the district kept trying to meet. There was also a cash offer that they could have taken that was $50,000 with reasonable attorney's fees. Amount unspecified because no demand had been made. There was an offer in March that was based upon a proposal that the parent made. And so I don't think that the court's decision does what appellant suggested does, which is shove down the throat an agreement that was not voluntary. What was the May 4th offer? I'm sorry, the May 3rd offer. The May 3rd offer. $150,000 a year. $150,000 per year. Right. For five years. Until he graduated. Until he graduated, yes. And what was the provision in that offer that addressed whether he could come back to school and on what terms? It was that he would at least, if they took that offer, he would at least stay in that for one full school year and then there would be notice so that the district could assess and offer an IEP based on his current needs. I will note that the March, the same version of the settlement agreement that the district first proposed in response to what the parent proposed at the It did not have anything like that. It just allowed him to reenroll at any time. And that provision was added through negotiations between counsel and them wanting to address what happens if mom shows up. We want her to be able to opt in annually. So the May 3rd offer, your perspective on it is that, and that's the last offer the school district makes before the hearing, correct? It's the last of 3rd, yes. So that offer does allow him to go back into school, but there are restrictions on it. Or conditions on it. Well, there, obviously the parties had not previously been able to agree on how to get him to school, and so it tried to lay out a plan for if that wanted to happen, how that could happen without a whole bunch of litigation. And so it really was a plan based upon negotiations between the parties that went on for several months. You know, the parent was free to accept the $50,000 offer that was conditioned on nothing. I mean, she was free to enroll him at school. Nobody ever told her you cannot enroll him in school. And, in fact, the district, in the face of that demand, prior to making the two IEP offers that we eventually went to hearing over, specifically said, we don't want to pay you to just keep him out of school. The parents all along had said that he had only made progress under her tutelage in the home with a one-to-one behavioral aid. That was the program they touted. She testified at hearing. That's what she wanted was a program that looked a lot like the program he had now, which was his stay-put program, which is the program they're now saying we tried to shove down their throat through a settlement offer. And so I do not believe that that was in any way shoved down their throat, or a take it or leave it, take this, or we're buying you out. It really was at their suggestion, and the district resisted that for a full year before it even engaged in those discussions. And it was when it was facing this hearing, 27-day hearing, over every page of the settlement that included 15 people, the district knew how much this litigation would cost and was trying to spend that money to reach agreement with the family rather than on this litigation, which obviously has been ongoing now for about 10 years. If the court doesn't have any more questions, I believe I'm out of time. We took you there. Thank you for the argument. Thank you. We're over time for rebuttal. We'll still give you a minute to. I'll try to be very brief. First of all, there was another difference between the settlement offer and the counter offer, and that was the settlement offer did not include attorney's fees, and that was a clearly erroneous finding on the part of the district judge who said that they did. It did not. And if you read it, there's nothing in there about attorney's fees, and it specifically says no attorney's fees, except it's provided in this agreement. There were none in the agreement. Secondly the It didn't say payment of fees if the parties could agree? No. Without any kind of prescription? It said nothing. Nothing. Had there been a demand for a fee amount before then? Of course. Well, there had been a no. The actual amount had not been given until the counter offer. There was a demand, specific demand in the counter offer. But the school district didn't respond. They did offer reasonable attorney fees all along, hadn't they? Not in that agreement. Well, in that proposal. It wasn't explicitly included. Is that what you're saying? What I'm saying is that if we were held to accept that agreement on May 4th and they had no fees after that, we would have accepted an agreement that did not include any attorney's fees. Well, was there any effort to clarify? Yes. We offered a counter offer. That was the $250,000. Did you ask them and get on the phone and say there's no provision for attorney fees in here? Is that intentional? No, we didn't. We simply countered with what we the other issues, because that was only one of them. But what you're asking us to accept is that that offer was different because it omitted attorney fees, and you didn't bother to clarify it. It's not a question of bothering. We responded to it. We said here, you know, this is what we will accept, which includes attorney's fees. It wasn't there. And a dollar figure. And a dollar figure. But the prior offer that you were responding to in your counter offer for $250,000 plus the fees was an offer, we'll pay fees, but only if reasonable, subject to agreement. There had been earlier discussions with respect to the first offer, which said and, of course, reasonable attorney's fees. The second offer included reasonable attorney's fees. This one, the cover letter, said nothing about attorney's fees and didn't say and it didn't include attorney's fees. Now, I don't think that we were, they were actually proposing to provide no attorney's fees. But the point is that this was, the judge thought it had it in it, and therefore we should have accepted it. And it didn't. So we certainly at least had to negotiate that provision. The second point is that the school district claims that what it offered in the 2007 IEP, you know, was, would have been sufficient. Well, it seems to me that that has to be a jury issue. That's what they claim. We have a right to dispute it. And we, in fact, would dispute it. And so, again, on its face, it's, you know, it was the same offer. Secondly, thirdly, on the degree of success, yes, degree of success is important. But there is not a single case that cuts off attorney's fees completely after a settlement offer on a degree of success analysis. The, you know, we actually prevailed in the district court. We got no fees for that. This was litigation brought on by the school district. So degree of success simply doesn't justify cutting off fees as of the date of settlement offer completely to zero. Fourth, the $48,000. Fourth out of how many? Well. Make it four. All right. The $48,000 was all incurred before the Rule 68 offer and was all defending against school, the school district's frivolous efforts to challenge this decision in luck. We were defending. We did not spend that money to try to recover the claim. Thank you. Thank you. We thank both counsel for your helpful arguments in a very complicated case. The case just argued is submitted. We're adjourned.
judges: Rosenthal, Fisher, Clifton